# Exhibit 8

| | |
|---|---|
| DISTRICT COURT<br>CITY & COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED: July 16, 2015 11:32 AM<br>CASE NUMBER: 2014CV34530 |
| **Plaintiffs:**<br>STATE OF COLORADO, ex rel. CYNTHIA H. COFFMAN, ATTORNEY GENERAL, and JULIE MEAD, ADMINISTRATOR, UNIFORM CONSUMER CREDIT CODE,<br><br>v.<br><br>**Defendants:**<br>CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC., a not-for-profit company; COLLEGEAMERICA DENVER, INC. and COLLEGEAMERICA ARIZONA, INC., divisions thereof, d/b/a COLLEGEAMERICA; STEVENS-HENAGER COLLEGE, INC., a division thereof, d/b/a STEVENS-HENAGER COLLEGE; COLLEGEAMERICA SERVICES, INC., a division thereof; THE CARL BARNEY LIVING TRUST; CARL BARNEY, Chairman; and ERIC JUHLIN, Chief Executive Officer, | ▲ **COURT USE ONLY** ▲<br><br>**Case Number:**<br><br>**2014CV34530**<br><br>**Courtroom: 275** |
| **COURT'S ORDER RE: PRELIMINARY INJUNCTION** | |

THIS MATTER comes before the Court on the State's motion for preliminary injunction filed on December 30, 2014. Defendants filed a response on February 27, 2015. The State filed a reply on March 24, 2015. A preliminary injunction hearing commenced on April 20, 2015 and continued through April 24, 2015. Closing arguments were held on May 8, 2015.

The Court, having reviewed the related pleadings and relevant portions of the Court's file, and being fully advised in the premises herein, Finds and Orders as follows:

## BACKGROUND

I.  *Overview*

The Center for Excellence in Higher Education, Inc. ("CEHE") is an Indiana not-for-profit corporation established in 2006. On December 31, 2012, Stevens-Henager College, Inc., CollegeAmerica Denver, Inc., CollegeAmerica Arizona, Inc.,

1

**Respondent Ex. 8 - 1**

California College, Inc., and CollegeAmerica Services, Inc., merged into CEHE (collectively "CollegeAmerica").

Prior to the December 31, 2012 merger with CEHE, Defendant Barney was the owner and sole shareholder of Stevens-Henager College, Inc., CollegeAmerica Denver, Inc., CollegeAmerica Arizona, Inc., California College San Diego, Inc., California College, Inc., and CollegeAmerica Services, Inc. Following the merger, Defendant Barney continued to serve as the chairman and sole member of CEHE.

In May 2010, Defendant Juhlin was hired to serve as President and Chief Executive Officer of CollegeAmerica. Defendant Juhlin presently serves in this role.

CollegeAmerica is accredited by ACCSC. To become accredited by a national accrediting body known as ACCSC, and to maintain accreditation, a college must satisfy ACCSC's "Standards," which are requirements set by ACCSC that cover the college's advertising, admissions, all aspects of a college's degree and course offerings, and student outcomes, including student satisfaction, graduation rates, and employment rates.

II.     *Advertisements and the Enrollment Process*

CollegeAmerica advertises on television, on the radio, through print media and mailers, and over the Internet.

CollegeAmerica's advertisements typically contain a telephone number for potential students to call. The purpose of the advertisements is to encourage students to call CollegeAmerica to schedule an appointment to visit one of the school's campuses for an admissions interview.

Interested prospective students are encouraged to visit a CollegeAmerica campus. During the campus visit, the potential student tours the campus and meets with an Admissions Consultant and a Financial Planner. Prospective students that decide to enroll must sign an Enrollment Agreement. The Enrollment Agreement contains the terms of enrollment and several prominent disclosures.

Enrollment in CollegeAmerica is a multi-step process which takes place over several weeks.  It is designed to provide students with information about attending CollegeAmerica.   The process is also designed to provide information and disclosures. The series of mutually-reinforcing steps provides progressively more information to prospective students as they advance through the enrollment process.   No student incurs any financial obligation until after completing the enrollment process and attending the first three weeks of classes.

2

CollegeAmerica monitors its admissions consultants and other employee's interactions with prospective students to ensure that they are following the College's rules and procedures.

III.    *EduPlan Loans*

CollegeAmerica offers students gap funding through an institutional loan program, called EduPlan. Students qualify for EduPlan loans regardless of their credit history. CollegeAmerica does not perform any underwriting prior to issuing an EduPlan loan.

## STANDARD OF REVIEW

C.R.S. § 6-1-110(1) authorizes a court to issue a preliminary injunction to enjoin ongoing violations of the CCPA:

> Whenever the attorney general or a district attorney has cause to believe that a person has engaged in or is engaging in any deceptive trade practice listed in section 6-1-105 or part 7 of this article, the attorney general or district attorney may apply for and obtain, in an action in the appropriate district court of this state, a temporary restraining order or injunction, or both, pursuant to the Colorado rules of civil procedure, prohibiting such person from continuing such practices, or engaging therein, or doing any act in furtherance thereof. The court may make such orders or judgments as may be necessary to prevent the use or employment by such person of any such deceptive trade practice or which may be necessary to completely compensate or restore to the original position of any person injured by means of any such practice or to prevent any unjust enrichment by any person through the use or employment of any deceptive trade practice.

C.R.S. § 6-1-110(1).

The purpose of the CCPA's provision for injunctions is to provide "prompt, economical, and readily available remedies against consumer fraud." *W. Food Plan, Inc. v. Dist. Court*, 598 P.2d 1038, 1041 (Colo. 1979). Granting preliminary injunctive relief is within the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless it is manifestly unreasonable, arbitrary or unfair. *Board of County Commissioners v. Fixed Base Operators*, 939 P.2d 464, 467 (Colo. App. 1997).

The Court "has a duty to ensure that the injunctive decree will effectively redress the proven violations and prevent further ones" where the Court finds that there have been numerous, long-range, and repeated violations of the CCPA. *State*

**Respondent Ex. 8 - 3**

*ex rel Woodard v. May Dep't Stores Co.*, 849 P.2d 802, 806 (Colo. App. 1992) (affirmed in part and reversed in part on other grounds by *May Dep't Stores Co. v. State ex rel Woodard*, 863 P.2d 967 (Colo. 1993).

When assessing injunctive relief, the Court must consider whether the relief adequately addresses the Defendants' violations of the CCPA and whether the relief will prevent future harm. *May Dep't Stores*, 863 P.2d at 978; *see also Federal Trade Comm'n v. Think Achievement Corp.*, 144 F.Supp. 2d 1013 (N.D. Ind. 2000) (upholding permanent injunction based on federal courts' broad authority to restrain acts which are of the same class or type as the unlawful acts defendant has committed), aff'd in relevant part rev'd in part on other grounds, 312 F.3d 259 (7th Cir. 2002).

## ANALYSIS

For claims brought under the CCPA, the State's motion for a preliminary injunction is subject to the test annunciated in *Rathke v. MacFarlane*, 648 P.2d 648, 653-54 (Colo. 1982). The *Rathke* factors are (a) there is a reasonable probability of success on the merits; (b) there is a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief; (c) there is not plain, speedy, and adequate remedy at law; (d) the granting of the preliminary injunction will not disserve the public interest; (e) the balance of the equities favors entering an injunction; and (f) the injunction will preserve the status quo pending a trial on the merits. *Id*.

For claims brought under the UCCC, there must be reasonable cause to believe that the Defendant is engaging in or is likely to engage in unconscionable conduct under UCC § 5-6-112. *State ex rel. Salazar v. Cash Now Store, Inc.*, 12 P.3d 321, 325 (Colo. App. 2000) ("We agree with the State's contention that the court should have made its determination of whether to grant the preliminary injunction under the UCCC's standard, rather than C.R.C.P. 65 and *Rathke v. MacFarlane, supra*.") (affirmed in relevant part by *State ex rel. Salazar v. The Cash Now Store, Inc.*, 31 P.3d 161, 167 (Colo. 2001)).

I.    *CollegeAmerica's Advertisments*

The Court finds that there is a reasonable probability of success on the merits for a very limited portion of the State's claim pursuant to the CCPA.

For a representation or statement to violate the CCPA it must be false, deceptive, or misleading. *See State of Colo. v. Mandatory Poster Agency, Inc.,* 260 P.3d 9, 14 (Colo. App. 2009); *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.,* 62 P.3d 142, 148 (Colo. 2003) (en banc).

4

The representation or statement must also "significantly impact[ ] the public as actual or potential consumers of the defendant's goods, services, or property." *Rhino Linings*, 62 P.3d at 146-147 ("Three affected dealers out of approximately 550 worldwide does not significantly affect the public."); *Hall v. Walter*, 969 P.2d 224, 234 (Colo. 1998).

The Court reviews CollegeAmerica's advertisements as a whole to determine whether there is a reasonable probability that CollegeAmerica has engaged in deceptive trade practices. *State ex rel. Suthers v. Mandatory Poster*, 260 P.3d. at 14-15.

CollegeAmerica ran an advertisement that contained the following representations:

- "You could Make More Money and Have a Real Career with the Right Degree."

- "Higher Education Could Mean Potentially Higher Earnings!"

- "You could earn about a million dollars more* over your lifetime if you hold the right degree."
  - The * refers to a footnote on the ad that states, "The amount of increased earnings varies by field and degree, and your actual earnings could be more or less than $1,000,000.  Source:  U.S. Census Bureau [website provided]."

- "According to the National Association of Colleges and Employers' (NACE) Fall 2010 Salary Survey, starting offers for graduates with a bachelor's degree in computer science averaged $60,473."

- "Starting offers for graduates with a bachelor's degree in information sciences and systems averaged $52,530."

- "For those with a degree in management information systems/business data processing, starting offers averaged $48,932."

- "In 2011, median starting salary for graduates with a bachelor's degree in accounting was $44,700.[2]"
  - The [2] refers to a footnote citing to the web page of the U.S. Bureau of Labor Statistics and states, "The actual salary may be higher or lower."
  - 
- "Salary ranges for graduates with a degree in accounting in 2010 were from $38,940 (the lowest 10%) to $106,880 (the top 10%)."

Pl. Ex. 4 at CollegeAmerica: DPOS004846

CollegeAmerica Associate's degree graduates earn, on average, $10.97 per hour. On the assumption that these graduates work and are paid for 2,080 hours per year, their starting annual wage would be $22,817.60.

CollegeAmerica's Bachelor's degree graduates earn, on average, $14.76 per hour.  On the assumption that these graduates work and are paid for 2,080 hours per year, their starting annual wage would be $30,700.80.

CollegeAmerica's records show that the average starting annual wages for students who graduated with a Bachelor's degree in Accounting was $27,810.00.

Students who graduated with one of the four Computer Science Bachelor's degrees offered by CollegeAmerica had average starting annual wages of $31,637.00.

The National Association of Colleges and Employers ("NACE") publishes an annual survey of nationwide starting salaries. CollegeAmerica cited the NACE survey in their advertisements.

In the years 2010-2014, NACE reported starting salaries for Bachelor's degree holders that ranged from approximately $44,000.00 to approximately $50,000.00. The average starting salary for this five-year period, according to NACE, was $47,336.00.

Based on CollegeAmerica's records, the NACE nationwide starting salary averages for Bachelor's degree holders are not representative of the starting salaries CollegeAmerca graduates can expect to earn.

The Court finds that the national wage data in CollegeAmerica's ads are not representative of the average starting salaries that CollegeAmerica graduates can expect to earn. Although CollegeAmerica's advertisements in the State's Exhibit 4 contain literally true statements about national wages, such statements can be pieced together in such a manner as to create a false expectation of the average CollegeAmerica graduate's starting salary. *See, e.g., Donaldson v. Read Magazine, Ind.*, 333 U.S. 178, 188-89 (1948) ("Advertisements as a whole may be completely misleading although every sentence separately considered is literally true. This may be because things are omitted that should be said, or because advertisements are composed or purposefully printed in such a way as to mislead.").

The State does not need to establish irreparable harm when enforcing a statute in the public interest.  *See Kourlis v. District Court*, 930 P.2d 1329, 1336 (Colo. 1997); *see also Lloyd A. Fry Roofing Co. v. State Dep't of Health Air Pollution Variance Bd.*, 553 P.2d 800, 808 (Colo. 1976) ("[I]t is not necessary to prove

6

irreparable injury or threat thereof, where the suit is in behalf of the public") *quoting Conway-Bogue v. Bar Association*, 312 P.2d 998, 1004 (Colo. 1957); *Bd. of Comm'rs v. Vandeower*, 205 P.3d 423, 431 (Colo. App. 2001) (finding that actions brought on behalf of the public that are "imbued with great public importance" dispense with the "immediate and irreparable injury" requirement).

Obviously, the harm that the State is seeking to prevent is consumers enrolling in CollegeAmerica under false promises. Prior to the preliminary injunction hearing on April 20, 2015, CollegeAmerica voluntarily pulled all advertisements containing statements about national wages from its solicitation campaign. In light of this voluntary action, the Court finds that there is no harm which may be prevented by injunctive relief pending the outcome of this case. The Court further finds that the balance of the equities favors not entering an injunction at this time. *Id.*

Considering CollegeAmerica's voluntary removal of all advertisements containing the NACE starting salary information during the pendency of this case, a preliminary injunction will not issue.

In regards to CollegeAmerica's other advertisements, the State has not met its burden for the purposes of a preliminary injunction.

II.     *Admissions Process*

Enrollment in CollegeAmerica is a multi-step process which takes place over several weeks.  It is designed to provide students with accurate information about the considerations most students find material in deciding whether to attend CollegeAmerica. The process is also designed to provide information and disclosures deemed necessary and appropriate by state, federal, and accrediting oversight agencies.  The series of mutually-reinforcing steps provides progressively more information to prospective students as they advance through the enrollment process.  No student incurs any financial obligation until after completing the enrollment process and attending the first three weeks of classes, which do not start until at least one week after the student signs the Enrollment Agreement, and several weeks after the student first saw any CollegeAmerica advertisement.

The process provides institutional safeguards to ensure that prospective students get the accurate information they need to make an informed decision about whether to enroll.

The Court finds that the State has not met its burden pursuant to *Rathke* in regards to its claim relating to the Admissions Process.

III.     *EduPlan Loans*

The State asserts CCPA and UCCC claims relating to CollegeAmerica's EduPlan program. The Court finds that the State has not established a reasonable probability of success under either the UCCC or CCPA for its claims relating to the EduPlan program.

First, the Court will address the State's CCPA claims relating to EduPlan. The State alleges that CollegeAmerica advertisements are misleading when they state that EduPlan helps make college "affordable."

CollegeAmerica offers students gap funding through an institutional loan program, called EduPlan. EduPlan plan loans help students who may otherwise be unable to attend CollegeAmerica pay for tuition. No credit check is required for EduPlan loans.

The terms of EduPlan loans are clearly disclosed. The loan amount, interest rate, and total payments are clearly provided.  CollegeAmerica monitors its financial planner's interactions with prospective students to ensure that they are following the College's rules and procedures.

There is no evidence of the College providing any false or misleading information about EduPlan loans. Further CollegeAmerica's statements that EduPlan helps make college "affordable" is not misleading.

Advertisements stating that the College's "gap" student loan program, which the College calls EduPlan helps make college more "affordable." *See Motion* ¶¶ 140-141.  Defendants' primary response is that the advertisements are true.  Without EduPlan many students would not be able to pay tuition; therefore, the loans do help students to afford college.

The State has not established a reasonably probability of success under the CCPA that CollegeAmerica's engaged in deceptive conduct through its statements that EduPlan helps make college "affordable."

Second, the Court will consider the State's UCCC claims relating to EduPlan. The State alleges that EduPlan loans are unconscionable because the College should have known that there was no possibility of repayment. The State further alleges that EduPlan loans are unconscionable because student-borrowers do not receive substantial benefits from the loan.

The EduPlan loans are credit transactions under the UCCC. C.R.S. §§ 5-1-301(11), (12). CollegeAmerica's practices related to EduPlan are subject to C.R.S. §5-6-112, which prohibits sellers of credit in the state of Colorado from engaging in unconscionable conduct in inducing consumers into credit transactions.

The State has not produced sufficient evidence that there is a reasonable probability that CollegeAmerica's EduPlan loans violate the UCCC.

8

Accordingly, the State has not met its burden in regards to its claims relating to EduPlan for the purposes of preliminary injunction.

## CONCLUSION

The Court Finds the Following:

I.    In light of CollegeAmerica's voluntary removal of all advertisements containing the NACE starting salary information, the Court ORDERS that a preliminary injunction is not necessary will not issue.

II.   In regards to the State's other claims, the Court FINDS that the State has not met its burden for the purposes of preliminary injunction.

IT IS THEREFORE ORDERED that the State' Motion for Preliminary Injunction is hereby **DENIED**.

DONE THIS 16th day of July, 2015.

BY THE COURT:

_____
R. MICHAEL MULLINS
District Court Judge

9