UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>           Petitioner,<br><br>v.<br><br>CENTER FOR EXCELLENCE IN HIGHER EDUCATION,<br><br>           Respondent. | **MEMORANDUM DECISION AND ORDER OVERRULING OBJECTION TO REPORT AND RECOMMENDATION**<br><br>Case No. 2:19-cv-00877-RJS-CMR<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

This matter arises from a Petition by the Bureau of Consumer Financial Protection (the Bureau) to enforce a Civil Investigative Demand (CID) against Respondent, the Center for Excellence in Higher Education (the Center) for potential violations of the Consumer Financial Protection Act.[1]  The Center objected to the CID, and this case was referred to Magistrate Judge Cecilia M. Romero pursuant to 28 U.S.C. § 636(b)(1)(B).[2]  Judge Romero issued a Report and Recommendation in which she recommends granting the Bureau's Petition to Enforce the CID as to information concerning the Center's private student loan program, and denying the CID as to information regarding previous litigation in which the Center has been a party.[3]  Now before the court is the Center's Objection to the Report and Recommendation.[4]  For the reasons explained below, the Center's Objection is OVERRULED.

---

[1] Dkt. 2 (Petition to Enforce Administrative Subpoena); *see also* 12 U.S.C. § 5567 *et seq.* (Consumer Financial Protection Act).

[2] Dkt. 22 (Order Re-Referring Case).

[3] Dkt. 46 (Report and Recommendation) at 12.

[4] Dkt. 47 (Objection to Report and Recommendation).

## FACTUAL BACKGROUND

The Bureau is an executive agency charged with "regulat[ing] the offering and provision of consumer financial products or services under the Federal consumer financial laws."[5]  The Bureau has the power to issue a CID—essentially a subpoena—whenever it "has reason to believe that any person may be in possession, custody, or control of any documentary material or tangible things, or may have information, relevant to a violation."[6]  The Bureau is funded through multiple mechanisms.  Annually, the Bureau's Director requests an amount from the Federal Reserve, not to exceed twelve percent of the Federal Reserve's total operating expenses.[7]  Additionally, the Bureau collects penalties in a separate fund called the "Consumer Financial Civil Penalty Fund," which is used to compensate victims of prohibited activities or, if not practicable, for consumer education and financial literacy programs.[8]  At any point, if the Bureau needs funds beyond these amounts, it must seek them through congressional appropriation.[9]

The Center is a private, non-profit organization that previously operated multiple institutions of higher education across fifteen physical campuses and one online college.[10]  As a function of its education services, the Center offered private financing, referred to as an EduPlan loan, to students who were unable to afford the full projected tuition costs.[11]  In April 2019, when

---

[5] 12 U.S.C. § 5491(a).

[6] *Id.* § 5562(c)(1).

[7] *Id.* § 5497(a)(2).

[8] *Id*. § 5497(d).

[9] *Id.* § 5497(e).

[10] Dkt. 16 (Response to Petition) at 7–8.

[11] *Id.*

the Bureau issued the CID, the Center employed approximately 1,900 people.[12]  But in August

2021, the Center closed all of its colleges and it currently has approximately fifteen employees.[13]

In December 2012 and September 2013, the Colorado Attorney General (Colorado AG)

served two subpoenas on the Center seeking records pertaining to: (1) the Center's educational

programs, (2) financial aid availability, (3) private financing options, and (4) other aspects of the

Center's school program dating back to 2006.[14]  The Colorado AG eventually filed a complaint

in Colorado state court against the Center in December 2014, alleging violations of Colorado's

Consumer Protection Act and the Colorado Uniform Consumer Credit Code.[15]  During the

ensuing litigation, the Center produced "hundreds of thousands of pages of documents in

discovery."[16]  During the course of that litigation, the Colorado AG was sanctioned by the

Colorado state court for sharing documents with the Bureau in violation of a sealing order.[17]

On April 12, 2019, the Bureau issued a CID to the Center, seeking the testimony of a

Center representative about: (1) the Center's private student loan program and (2) litigation

involving the Center's student loan program in which it had been a party since the beginning of

2012.[18]  The Bureau initially set an investigational hearing for May 21, 2019.[19]  After the Bureau

denied the Center's administrative petition to modify or set aside the CID, the hearing was

---

[12] Dkt. 47 at 8.

[13] *Id.*

[14] Dkt. 16 at 8–9.

[15] *Id.* at 9.

[16] *Id.*

[17] *Id.* at 10.

[18] Dkt. 2 at 3.

[19] *Id.*

rescheduled for October 11, 2019.[20]  The Center then informed the Bureau that it would not appear for the hearing without a court order.[21]

## PROCEDURAL HISTORY

The Bureau filed the instant Petition to Enforce the CID on November 11, 2019.[22]  It brough this action pursuant to 12 U.S.C. § 5562(e)(1), which authorizes the Bureau to petition the district court in "any judicial district in which [the respondent] resides, is found, or transacts business" for an order to enforce a CID.[23]  In the petition, the Bureau claimed it was seeking relevant information regarding the Center's EduPlan student loan program to assess whether the program constituted unfair, deceptive, or abusive acts or practices that potentially violated the Consumer Financial Protection Act (CFPA).[24]  The Bureau asked the court to order the Center to show cause why it should not be required to comply with the CID and to order the Center to fully comply.[25]

After the case was referred to Judge Romero,[26] the Center filed its Response to the Petition, claiming the CID was unenforceable for several reasons.[27]  First, the Center argued the Bureau is unconstitutionally structured because the CFPA "violates the separation of powers by conferring substantial executive powers on the Bureau's director without subjecting the director

---

[20] *Id.* at 4.

[21] *Id.*

[22] *See id.*

[23] 12 U.S.C. § 5562(e)(1).  The Center is located in, and transacts business in, Utah.  *See* Dkt. 2 at 3.

[24] Dkt. 2 at 6.

[25] *Id.* at 10.

[26] Dkt. 22.  The case was initially referred to Judge Romero pursuant to 28 U.S.C. § 636(b)(1)(A), to hear and determine all nondispositive pretrial matters.  *See* Dkt. 3 (Order Referring Case).  This referral was later updated to proceed under 28 U.S.C. § 636(b)(1)(B).  *See* Dkt. 22.

[27] Dkt. 16.

to presidential control."[28]  This leadership structure, the Center argued, renders the Bureau unconstitutional and therefore lacking authority to enforce the CID.[29]  At the very least, the Center noted the Bureau's constitutionality was a question pending before the Supreme Court, and argued this court should stay its ruling until the Court issued a decision.[30]  Second, the Center argued the CID was unreasonably oppressive because it covered a seven-year period, from 2012 until the date it was issued, and the legality of the EduPlan program had already been fully litigated in an action brought by the Colorado AG.[31]  Last, the Center argued the CID was "issued for an improper purpose," namely to create a "perjury trap" because the Bureau refused to provide the Center further elaboration on what it was seeking testimony about.[32]

The Bureau filed a brief in support of its Petition on January 15, 2020.[33]  On June 16, 2020, Judge Romero heard oral argument and took the matter under advisement.[34]

On April 20, 2022, Judge Romero issued a Report and Recommendation in which she recommended that the Petition to Enforce the CID be granted in part and denied in part.[35]  Judge

---

[28] *Id.* at 13.

[29] *Id.*

[30] *Id.* at 17–18.  The Supreme Court ultimately held the appointment structure of the Bureau unconstitutional. *See generally Seila Law v. CFPB*, 140 S.Ct. 2183 (2020).  The Court later noted, however, that actions taken by the Bureau while it was unconstitutionally structured were not thereby rendered void.  *See generally Collins v. Yellen*, 141 S. Ct. 1761 (2021) (rejecting the argument that the Director of an agency found to be unconstitutionally structured lacked authority and that its actions were inherently void).

[31] Dkt. 16 at 18–26.

[32] *Id.* at 29–30.

[33] Dkt. 22.

[34] Dkt. 32 (Minute Entry for Proceedings Before Judge Romero on June 19, 2020).  An initial hearing requiring the Center to show cause why it should not be ordered to comply with the CID was scheduled for December 30, 2019, but was reset to January 22, 2020 in light of additional briefing submitted by the parties.  *See* Dkt. 4 (Order to Show Cause); Dkt. 15 (Order Granting Leave to File Excess Pages) ("In light of the additional briefing to be submitted by the parties, the order to show cause hearing is hereby reset to January 22, 2019 [sic] [.]").  At the request of the parties, the hearing was reset for March 25, 2020.  *See* Dkt. 24 (Amended Notice of Hearing).  Then, due to the ongoing COVID-19 pandemic, was again reset for June 19, 2020 and conducted via Zoom.  *See* Dkt. 31 (Amended Notice of Hearing).

[35] Dkt. 46.

Romero recommended granting the CID with respect to questions regarding the Center's private student loan program, but found that requiring the Center to testify about all prior litigation it had been involved in would be overly burdensome.[36]  Judge Romero considered the Center's other arguments concerning the constitutionality of the Bureau and whether the CID was issued for an improper purpose, and rejected both.[37]  The Center filed a timely Objection to Judge Romero's Report and Recommendation on May 4, 2022.[38]

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 72(b)(3), when a party objects to a magistrate judge's recommended disposition, "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to."[39]  "The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."[40]

Concerning unobjected-to portions of a report and recommendation, the Supreme Court has suggested no further review by the district court is required, but neither is it precluded.[41]

---

[36] *Id.* at 10.

[37] *Id.* at 5–6, 11–12.

[38] Dkt. 47.

[39] Fed. R. Civ. P. 72(b)(3).

[40] *Id.*

[41] *See Thomas v. Arn*, 474 U.S. 140, 149 (1985) ("The [Federal Magistrate's Act] does not on its face require any review at all, by either the district court or the court of appeals, of any issue that is not the subject of an objection."); *id.* at 154 (noting that "it is the district court, not the court of appeals, that must exercise supervision over the magistrate," so that "while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.").

Accordingly, this court reviews the unobjected-to portions of Judge Romero's Report and Recommendation for clear error.[42]

## ANALYSIS

At the outset, it is helpful to establish which parts of the Report and Recommendation the Center has objected to—and as such must be reviewed *de novo*.  The court notes three specific objections:[43] (1) the Bureau's structure violates the Constitution by shielding it from the congressional appropriations process,[44] (2) the CID was issued for an improper purpose and is unreasonably oppressive,[45] and (3) if a response is required, the court should permit ninety days where Judge Romero's recommendation to order a response within thirty days provides insufficient time for the Center to prepare testimony.[46]  The court considers each objection in turn.

---

[42] Under the Tenth Circuit's "firm waiver" rule, without a timely and specific objection, appellate review of both factual and legal questions is generally waived.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057,1059 (10th Cir. 1996) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).  And while the court may choose not to apply the firm waiver rule "when the interests of justice so dictate," there is no discernable reason in the record mandating such a course.  *Moore,* 950 F.2d at 659 (citations omitted) (joining other courts to conclude the firm waiver rule need not apply to pro se litigants who were not advised of the consequences of any failure to object).  Within its discretion, the court nevertheless elects to review the unobjected-to portions of Judge Romero's Report and Recommendation for clear error.

[43] The Center briefly asserts two additional arguments, without citation to factual or legal support.  First, the Center argues the CID is unreasonably oppressive because the Bureau has offered no explanation for requesting information about the EduPlan loan program dating back to 2012.  *See* Dkt. 47 at 9.  The Bureau has met its initial burden of demonstrating the inquiry is within its authority and the information sought is "not too indefinite" and is reasonably relevant.  *See United States v. Morton Salt Co.*, 338 U.S. 632, 652–53 (1950).  The Center offers no authority, and the court is aware of none, requiring the Bureau to further justify the scope of its inquiry.  *See* Dkt. 47 at 9.  Second, the Center argues the CID was issued for an improper purpose, evidenced by the fact that the current Bureau Director provided expert testimony in prior litigation by the Colorado AG against the Center.  *Id.*  This assertion is without legal or factual merit, and "[m]ere allegations are not enough to put the agency's good faith in issue." *Martin v. Gard*, 811 F.Supp. 616, 624 (D. Kan. 1993).  The court declines to grant the Center's request to prevent the current Bureau Director from being involved in this case based solely on unsubstantiated allegations of bad faith— particularly where the Center has failed to provide any explanation of how the Director's involvement would prove prejudicial.

[44] *See* Dkt. 47 at 5–8.

[45] *Id*. at 8–10.

[46] *Id*. at 11.

I.        **The CID is Within the Authority of the Bureau**

In the intervening period between Judge Romero hearing oral argument and releasing her Report and Recommendation, the Supreme Court issued an opinion deeming the appointment and removal mechanism for the Bureau Director unconstitutional.[47]  But the Court also held the appointment mechanism severable from the rest of the CFPA, allowing the Bureau to continue to exist and operate.[48]  The Supreme Court has also held that an agency director, whose for-cause removal protections are held unconstitutional, can ratify prior decisions after the agency has been restructured.[49]  Thus, actions taken by the director, while subject to unconstitutional removal protections, are not irredeemably void.[50]  The Bureau's Director, now removable by the President at will, has reconsidered and decided to ratify the CID issued to the Center.[51]

The Center does not contest the effect of these holdings.[52]  Rather, the Center now argues the Bureau is unconstitutionally structured for another reason, contending that "[e]xempting the [Bureau] from the appropriations process improperly frees it from congressional control" and "violates the separation of powers."[53]  The Center further argues that, unlike the appointments clause issue it initially argued (and which the Supreme Court resolved in *Seila Law*), the Bureau's exclusion from the appropriations process creates a separation of powers problem that

---

[47] *See Seila Law*, 140 S.Ct. 2207–08 (holding that the Bureau is unconstitutionally structured because of its Director's for-cause removal provisions).

[48] *Id.* at 2211 (holding the constitutionally infirm for-cause removal provision severable from the remainder of the CFPA).

[49] *Collins*, 141 S. Ct. 1761 (rejecting the argument that the Director of an agency found to be unconstitutionally structured lacked authority and that its actions were void).

[50] *Id.* at 1787–89.

[51] Dkt. 34 (Petitioner's Notice of Ratification and Response to Respondent's Notice of Supplemental Authority) at 1–2; Dkt. 34-1 (Declaration of Kathleen L. Kraninger) at 2.

[52] *See* Dkt. 47 at 5–6.

[53] *Id.* at 7.

is not severable.[54]  The court finds this argument unavailing because: (1) it appears the Center previously raised and subsequently waived this argument before Judge Romero and (2) dicta in *Seila Law* suggests the Bureau's funding structure is not an unconstitutional delegation of power from Congress to the Executive Branch.[55]

First, although the Center raised concern with the Bureau's appropriations process in its briefing,[56] it waived this argument by expressly disavowing it during oral argument before Judge Romero, focusing instead on the Bureau's appointments mechanism.[57]  Judge Romero directly asked counsel for the Center, "We are only talking about a 'for cause' provision, right?  There are no other constitutional issues or ramifications that I need to be aware of?"[58]  Counsel responded:

> The quick answer is, it's the 'for cause' provision.  There is some discussion in the *Seila Law* case about the appropriations aspect of the Consumer Financial Protection Act.  I don't think in our context or in any other ones that are addressing the constitutional structure that that's the primary issue.  It's the 'for cause' removal provision.[59]

---

[54] *Id.* at 8 ("Dismissal of the CID is appropriate here 'because the [Bureau] lacked authority to use the funds necessary to pursue the enforcement action against [the Center].'" (quoting *CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 233–34 (5th Cir. 2022) (Jones, J. concurring))).

[55] *See Seila Law*, 140 S.Ct. at 2209 ("The *only* constitutional defect we have identified in the [Bureau's] structure is the Director's insulation from removal.  If the Director were removable at will by the President, the constitutional violation would disappear." (emphasis added)).  Since *Seila Law* was issued, at least one court has relied on its dicta to hold that the Court "implied that the [Bureau's] source of funding itself did not present a constitutional defect." *CFPB v. Fair Collections & Outsourcing, Inc.*, No. GJH-19-2817, 2020 WL 7043847, at *9 (D. Md. Nov. 30, 2020) (citing *Seila Law LLC.*, 140 S.Ct. at 2204, 2209); *see also* Hearing Transcript at 55, *CFPB v. Law Offices of Chrystal Moroney, P.C.*, No. 7:20-cv-03240 (S.D.N.Y. Aug. 19, 2020) ("[A]lthough the Bureau's funding structure was not directly at issue in *Seila Law*, in deciding to sever the for-cause removal provision of the CFPA, the Supreme Court did note 'the only constitutional defect we have identified in the [Burea's] structure is the director's insulation from removal,' and that that constitutional defect 'disappear[ed]' with a director removable at will by the President."), *cited with approval in Fair Collections & Outsourcing*, 2020 WL 7043847, at *9.

[56] In its Response to Petition, the Center notes: "the Bureau is exempt from the ordinary congressional appropriations process.  The Bureau instead receives its annual funding from the Federal Reserve Board.  Simply put, the Bureau director is beyond the reach of any elected branch." Dkt. 16 at 14 (internal citations omitted).  However, the Center did not explicitly argue that this appropriations exemption alone renders the Bureau unconstitutional.

[57] *See* Dkt. 32 (Recording of Oral Argument Before Judge Romero on June 19, 2020) at 32:50–39:21.

[58] *Id.* at 32:50–33:01.

[59] *Id.* at 38:53–39:21.

This interaction reveals that the Center did not request that Judge Romero consider the constitutionality of the appropriations structure as a theory of relief.

"Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived."[60]  Even assuming this court would "not abuse its discretion by accepting the new argument,"[61] there have been no changes in the factual or legal circumstances that would cause the court to consider the Center's appropriations argument as now being proper.  There are no new factual circumstances concerning the funding structure of the Bureau.  The funding structure of the Bureau has not changed over the course of this litigation—in fact, the Bureau's funding structure has not materially changed since it was created in 2011.[62]  Additionally, while there were significant developments in the law during the period between oral argument and Judge Romero's Report and Recommendation,[63] the constitutional challenge of the Bureau's funding structure was not a completely novel legal theory the Center could not have advanced in front of Judge Romero at the time.[64]

"[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the

---

[60] *ClearOne Commc'ns, Inc. v. Biamp Sys.*, 653 F.3d 1163, 1185 (10th Cir. 2011) (quoting *Marshall v. Chater*, 75 F.3d 1421, 1426–27 (10th Cir. 1996)).

[61] *Stephens v. Tolbert*, 471 F.3d 1173, 1176 (11th Cir. 2006).

[62] *See* 12 U.S.C. § 5497(a)(2).

[63] *See, e.g.*, *Seila Law*, 140 S.Ct. 2183; *Collins*, 141 S. Ct. 1761.

[64] *See* Dkt. 16 at 14 ("On top of that, the Bureau is exempt from the ordinary congressional appropriations process. The Bureau instead receives its annual funding from the Federal Reserve Board.") (internal citations omitted); *see also CFPB v. All Am. Check Cashing, Inc.*, 952 F.3d 591, 594–95 (5th Cir. 2020) (Higginbotham, J., concurring), *vacated*, 33 F.4th 218 (5th Cir. 2022); *id.* at 605, 608 (Smith, J., dissenting); *PHH Corp. v. CFPB*, 881 F.3d 75, 95–96 (D.C. Cir. 2018); *id.* at 146–47 (Henderson, J., dissenting).

purpose of the Magistrates Act."[65]  Based on the Center's briefing and oral argument before Judge Romero, the court concludes the Center has waived its argument concerning the constitutional deficiency of the Bureau's appropriations process.  The court will nevertheless briefly discuss the merits of the Center's argument.

In support of the proposition that the appropriation structure for the Bureau renders the agency unconstitutional, the Center cites a concurring opinion to a Fifth Circuit *en banc* decision describing the Bureau's funding structure as "wholly unprecedented."[66]  This concurrence is nonbinding and, after careful consideration, this court does not find its reasoning persuasive.

The Center correctly notes that *Seila Law* did not directly address the constitutionality of the Bureau's funding structure.[67]  However, the Supreme Court discussed the Bureau's appropriations process, acknowledging  that "[t]he director does not even depend on Congress for annual appropriations."[68]  The Court nonetheless went on to make clear that the "only constitutional defect … in the [Bureau's] structure is the Director's insulation from removal,"[69] and described the Bureau's funding structure merely as an aggravator of the "agency's threat to Presidential control."[70]  The Court went as far as saying the Bureau's constitutional infirmity would "disappear" if "the Director were removeable at will by the President."[71]  Taken together,

---

[65] *Greenhow v. Sec'y of Health & Human Servs.*, 863 F.2d 633, 638–639 (9th Cir.1988), *overruled on other grounds by United States v. Hardesty*, 977 F.2d 1347 (9th Cir. 1992), *cert. denied*, 507 U.S. 978 (1993); *see also Marshall*, 75 F.3d at 1426 (holding "issues raised for the first time in objections to magistrate judge's recommendations are deemed waived"); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990–91 (1st Cir. 1988) (holding that "an unsuccessful party is not entitled as of right to de novo review . . . of an argument never seasonably raised before the magistrate").

[66] Dkt. 47 at 5–8 (citing *All Am. Check Cashing, Inc.*, 33 F.4th at 233–34 (Jones, J. concurring)).

[67] *Id.* at 6.

[68] *Seila Law*, 140 S.Ct. at 2203.

[69] *Id.* at 2209.

[70] *Id.* at 2204.

[71] *Id.* at 2209.

these comments suggest the Bureau's funding structure does not represent an unconstitutional delegation of power from Congress to the Executive Branch.[72]  Because the court does not find the Bureau's appropriations structure unconstitutional, the Center's subsequent argument concerning the severability of this provision is moot.

## II.        The CID is not Overly Burdensome, as Limited by Judge Romero

Congress has conferred the Bureau authority to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws."[73]  To enforce this, the Bureau may "issue in writing … a civil investigative demand [CID]" whenever is "has reason to believe that any person may be in possession, custody, or control of any documentary material or tangible things, or may have information relevant to a violation."[74]  The Bureau's authority "to request records and undertake other investigatory functions is extremely broad."[75]  But courts are still entrusted to ensure that governmental investigations of corporate matters are not "of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power."[76]  In short, the Bureau must show that a CID inquiry is "within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant."[77]  If the agency satisfies this initial burden of proof, "the burden shifts to

---

[72] The court's interpretation of *Seila Law* on this point generally comports with other jurisdictions.  *See, e.g., Fair Collections & Outsourcing, Inc.*, 2020 WL 7043847, at *9 (holding that the Supreme Court decision in *Seila Law* "implied that the [Bureau's] source of funding itself did not present a constitutional defect") (citing Hearing Transcript at 55, *CFPB v. Law Offices of Chrystal Moroney, P.C.*, No. 7:20-cv-03240 (S.D.N.Y. Aug. 19, 2020) ("[A]lthough the Bureau's funding structure was not directly at issue in *Seila Law*, . . .  the Supreme Court did note 'the only constitutional defect we have identified in the [Bureau's] structure is the director's insulation from removal,' and that that constitutional defect 'disappear[ed]' with a director removable at will by the President.")).

[73] 12 U.S.C. § 5491(a).

[74] *Id.* § 5562(c)(1).

[75] *Santa Fe Energy Prod. Co. v. McCutcheon*, 90 F.3d 409, 414 (10th Cir. 1996) (citing *Morton Salt Co.*, 338 U.S. at 642–43).

[76] *Morton Salt*, 338 U.S. at 642–43.

[77] *Id.* at 652–53.

12

the respondent to show cause why it should not be compelled to comply with the subpoena."[78] In order to satisfy the burden to show cause why it should not be compelled to comply with the CID, the Center must establish either: (1) that "the subpoena is overly broad or burdensome," or (2) "that enforcement would constitute an abuse of the court's process."[79]

In its Objection to Judge Romero's Report and Recommendation, the Center asserts two reasons why it should not be compelled to comply with the CID, both on the basis that the subpoena is overly burdensome.[80]  First, the Center argues the conclusion of the litigation in the Colorado state court action makes the CID overly burdensome because the Center is "entitle[d] to finality" in litigation regarding its EduPlan loan program.[81]  Second, the Center notes that "[i]n the multi-year interim between the Bureau's issuance of the CID and Judge Romero's report, [the Center's] circumstances have significantly changed."[82]  Specifically, the Center notes it has closed its colleges and now employs only fifteen people—as compared to 1,900 employees when the CID was issued.[83]  As a result, the Center argues it has lost "significant institutional knowledge," rendering the CID overly burdensome to fulfil.[84]  The court considers each objection in turn.

The Center argues the CID is overly burdensome because Colorado courts have already found that the Center's EduPlan loan program was not unconscionable—and asking it to undergo

---

[78] *FTC v. Complete Merch. Sols., LLC*, No. 219-CV-00996-HCN-EJF, 2020 WL 2059847, at *2 (D. Utah Apr. 28, 2020) (internal quotation marks and citation omitted).

[79] *Perez v. Algeria*, No. 15-MC-401-SAC, 2015 WL 4744487, at *2 (D. Kan June 24, 2015) (quoting *Martin*, 811 F.Supp. at 620).

[80] Dkt 47 at 8–10.

[81] *Id.* at 9.

[82] *Id.* at 8.

[83] *Id.*

[84] *Id.* at 7–8.

another investigation into the same conduct is unreasonable.[85]  Ultimately, the Center requests the CID be limited "to the time period after the close of evidence in the Colorado trial."[86]  The court declines to do so.

The Bureau has "broad authority"[87] to investigate potential violations of federal consumer financial protection law.[88]  The Center's assertion that the legality of the EduPlan program has already been fully litigated is only partially accurate.  The Colorado AG brought its suit under Colorado law and did not raise any claims under the CFPA.  Here, the Bureau is investigating, on behalf of individuals nationwide, whether the Center violated any aspect of *federal* consumer financial protection law.[89]  This investigation is appropriate "merely on suspicion that the law is being violated, or even just because [the Bureau] wants assurance that it is not."[90]  The Center has cited no authority—and this court is aware of none—to support the proposition that a prior state court judgment renders an investigation of potential federal claims under the CFPA unduly burdensome.

Furthermore, Judge Romero recommended limiting enforcement of the CID to information concerning the Center's private student loan program.[91]  If so limited, the Center would no longer be required to provide information regarding any previous litigation in which it has been a party since 2012, including the Colorado AG case.[92]  While the Center's preparations

---

[85] *Id.* at 10.

[86] *Id.*

[87] *See Santa Fe Energy Prod. Co.*, 90 F.3d at 414.

[88] 12 U.S.C. § 5491(a).

[89] Dkt. 2 at 2.

[90] *Morton Salt Co.*, 338 U.S. at 642–43.

[91] Dkt. 46 at 12.

[92] *Id.*

14

to comply with the CID may substantively overlap with its preparation for the Colorado AG case, the Center has not provided a reasoned analysis of why this would make compliance unduly burdensome.  The court notes that the occurrence of a four-week trial in which the Center produced "hundreds of thousands of pages of documents in discovery," tends to show that the Center has spent significant time collecting materials and evidence related to its loan program.[93] As opposed to requiring a large amount of additional data collection and interviews, the thoroughness of the Colorado trial suggests the Center may already have significant material readily available to answer the Bureau's questions.  Regardless, the burden is on the Center to establish that the request is unreasonable.  It has failed to do so.

The Center has also failed to establish that its reduction in workforce renders the CID unduly burdensome.  The Bureau issued the CID on April 12, 2019.[94]  The Center has had more than three years' notice to preserve any information it thought may be relevant to the Bureau's investigation.  The fact that the Center has closed its campuses—and relinquished "institutional knowledge" regarding its own education loan program—before complying with the CID does not render the CID overly burdensome.[95]  "[C]ourts have refused to modify investigative subpoenas unless compliance threatens to unduly disrupt or seriously hinder normal operations of a business."[96]  In its Response to the Petition, the Center estimated that enforcement of the CID would require its CEO, Eric Juhlin, to prepare for "at least three full weeks (120 hours)" and argued that enforcement would significantly disrupt important business operations because "Juhlin is responsible for the oversight of roughly 1,900 employees employed at four colleges

---

[93] Dkt. 16 at 9.

[94] Dkt. 2.

[95] *Id.* at 7.

[96] *FTC v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977).

over numerous campuses."[97]  These issues no longer impact the Center's response to the CID.

First, because Judge Romero limited the scope of the CID to information regarding the Center's

private student loan program, Juhlin no longer must "review [] hundreds of pages of materials"

from the Colorado AG case and he no longer has to "prepare to testify fully on the substance of

the issues litigated."[98]  Second, Juhlin now has only fifteen employees, and no colleges, to

oversee.[99]

      Because the "burden of showing that the request is unreasonable is on the subpoenaed

party," the court must look to the evidence the Center has provided.[100]  The Center's evidence is

wholly insufficient to satisfy its burden.  The Center has pointed to nothing in its Objection that

establishes an unreasonable burden.  The Center has not proffered a timeline for how long it will

take to comply given its new circumstances, nor has it detailed how compliance with the CID, as

limited by Judge Romero, would "unduly disrupt" its business operations.[101]  "[S]ome burden on

subpoenaed parties is to be expected and is necessary," and the Center has not offered any

evidence that would enable the court to conclude that the burden imposed is an unreasonable

one.[102]

      For the reasons explained, the court concludes the CID is neither unreasonable nor

unduly burdensome.

---

[97] Dkt. 16 at 26–27 (citing Dkt. 16-2 (Juhlin Declaration) ¶ 5).

[98] *Id.*

[99] Dkt. 47 at 8.

[100] *Complete Merch. Sols., LLC*, 2020 WL 2059847, at *11 (citing *Texaco*, 555 F.2d at 882).

[101] *Texaco,* 555 F.2d at 882.

[102] *Complete Merch. Sols., LLC*, 2020 WL 2059847, at *11 (citing *Texaco*, 555 F.2d at 882).

### III.      The Center Should be Granted Additional Time to Prepare

Notwithstanding the conclusion that the Center's changed circumstances do not provide a basis to find the CID unduly burdensome, the court sees fit to grant the Center's request for a ninety-day extension from the entry of this order.  The Center notes that significant time has elapsed since the CID's issuance in 2019, and "any witness preparation conducted before the matter was taken under advisement will have to be revisited if not fully redone."[103]  The Center further notes that, "given the substantial turnover in [the Center's] staff since the closure of its colleges, preparing for testimony now will be more burdensome than it would have" otherwise been.[104]  The court finds these arguments compelling.

While the Bureau issued the CID over three years ago, it would have been impractical for the Center to invest significant time and money into preparation while an order from this court was outstanding—an order which could have made such expenditure unnecessary.  The court is aware of no prejudice the Bureau would experience from the Center having a ninety-day extension to comply with the CID, especially given that "limitations on CFPA claims begin to run on the date of discovery of the violations."[105]  It is unclear at this investigatory stage what, if any, violations have been discovered that would implicate concerns about the relevant statute of limitations beginning to run.  Further, because the Center has closed its colleges and ostensibly no longer offers the loan program at issue to new individuals, the court is not concerned that a

---

[103] Dkt. 47 at 11.

[104] *Id.*

[105] *See* Dkt. 22 at 3 ("[B]ecause limitations on CFPA claims begin to run on the date of discovery of the violations, it's impossible during an investigation to determine whether any conduct falls outside the limitations period." (citing 12 U.S.C. § 5564(g)(1) ("[N]o action may be brought . . . more than 3 years after the date of discovery of the violation to which an action relates."))).

minor delay in this investigation would expose new individuals to potential violations of consumer financial protection laws.

For the reasons explained above, the court grants the Center's request for a ninety-day extension from the issuance of this order.

### IV.   The Remainder of the Report and Recommendation Reveals no Clear Error

Having reviewed the remainder of the Report and Recommendation, the court finds no clear error in any of Judge Romero's conclusions.  Indeed, the Report is well-supported by the record and cited legal authorities.

### CONCLUSION

For the reasons stated above, the Center's Objection to Judge Romero's Report and Recommendation[106] is OVERRULED.

The Bureau's Petition to Enforce Civil Investigative Demand[107] is GRANTED as to information concerning the Center's private student loan program and DENIED as to information concerning any previous litigation in which the Center has been a party since 2012.[108]  The Center is ORDERED to comply with the Bureau's CID, in accordance with this Order, within ninety (90) days of the issuance of this Order.

The Clerk of Court is directed to close the case.

SO ORDERED this 13th day of September, 2022.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[106] Dkt. 47.

[107] Dkt. 2.

[108] *See* Dkt. 46.

18